921 P.2d 309

**Rosina M. TANUZ, Plaintiff–Appellant,**

v.

**Terry L. CARLBERG, D.M.D.,
Defendant–Appellee.**

No. 16798.

Court of Appeals of New Mexico.

May 30, 1996.

Certiorari Denied July 11, 1996.

Mark L. Ish, Carol J. Ritchie, Felker, Ish, Hatcher, Ritchie Sullivan & Geer, P.A., Santa Fe, for Appellant.

Arthur O. Beach, Keleher & McLeod, P.A., Albuquerque, for Appellee.

## OPINION

APODACA, Chief Judge.

1. Plaintiff appeals the trial court's dismissal of her action entered pursuant to SCRA 1986, 1–041(B) (Repl.1992). The dismissal was filed in a bench trial at the close of Plaintiff's case-in-chief. In her complaint against Defendant, an oral and maxillofacial surgeon, Plaintiff sought damages based on her claims of dental malpractice and strict liability. Plaintiff alleged injuries arising out of surgical insertion by Defendant of interpositional implants (implants) in Plaintiff's temporomandibular joints (TMJs). On appeal, Plaintiff contends that Defendant should be held strictly liable as a supplier of the defective implants. Alternatively, Plaintiff contends that Defendant was negligent for failing to contact her after her surgery as the defective nature of the manufactured implants became known. As a matter of public policy, we hold that Defendant cannot be held strictly liable for implanting a product later shown to be defective. We also hold that substantial evidence supported the trial court's determination that Defendant did not breach his duty to warn Plaintiff under Plaintiff's negligence theory. We therefore affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

2. Defendant practiced surgery in Santa Fe. He first saw Plaintiff as a patient in March 1983 after a referral by Dr. Keith Jameson, a dentist. Plaintiff complained of TMJ pain and was diagnosed as suffering from bilateral derangement of the TMJ. In September 1983, Defendant surgically implanted TMJ implants manufactured by Vitek, Inc. The implants were manufactured using Proplast, a teflon-based substance patented by Vitek. At the time, the Vitek implants were being touted as having a greater success rate than other treatments. Defendant advised Plaintiff to return for routine follow-up care and to return if she experienced pain or discomfort.

3. On April 27, 1984, Plaintiff returned to Defendant's office, complaining of pain in her TMJs. Defendant's notes from that visit indicate that Plaintiff had failed to make her appointments after the previous visit. He referred her to Dr. Jameson to have her splint replaced. Plaintiff did not see Dr. Jameson after the referral and failed to continue follow-up treatment with Defendant, contrary to his advice. In 1987, Plaintiff began experiencing TMJ pain and self-treated this pain with over-the-counter medication. In November 1989, Plaintiff visited an Albuquerque dentist and was referred to Dr. Steven J. Traub, an oral and maxillofacial surgeon practicing in Albuquerque. Plaintiff informed Dr. Traub that she had seen Defendant for TMJ surgery but failed to tell him that she had implants. Dr. Traub did not notice the implants on the x-ray he had ordered. He diagnosed her as suffering from degenerative joint disease and prescribed pain and anti-inflammatory medication.

4. In September 1991, Plaintiff was again referred to Dr. Traub when she complained of a grinding sound and a popping episode that had occurred recently. Dr. Traub once again failed to identify Plaintiff's implants on another x-ray, but he did observe that a

comparison with the 1989 x-ray showed there had not been advancement of her degenerative disease. He again prescribed pain and anti-inflammatory medication. On both of these visits, Plaintiff was instructed to return for follow-up care but failed to do so. In October 1993, Plaintiff contacted Defendant's office after watching a television show that discussed problems with Vitek implants. Defendant surgically removed Plaintiff's implants in February 1994.

5. Plaintiff filed her complaint against Defendant in June 1994. In addition to her strict liability claim, Plaintiff alleged that Defendant was negligent in failing to warn her of the dangers posed by the Vitek implants. Specifically, Plaintiff alleged that Defendant should have contacted her before any official warnings from the manufacturer about the product had arisen, based solely on problems he himself had experienced with his own patients and a growing awareness in the medical community that Vitek implants posed dangers to patients. Plaintiff also alleged that, when Vitek and the Food and Drug Administration alerts appeared in 1990 and 1991, Defendant made inadequate attempts to locate her. At trial, Plaintiff relied primarily on Defendant's own testimony and the testimony of Dr. Traub, who stated that, in his opinion, Defendant breached the standard of care. We recite this testimony in detail in our discussion of Plaintiff's negligence claim.

6. After the close of Plaintiff's case-in-chief, the trial court ruled against Plaintiff's strict liability claim and found that Defendant did not breach the recognized standard of care. The trial court also determined that Plaintiff's own negligence in failing to return for follow-up care with Defendant or another physician constituted an independent intervening cause of any injuries she may have sustained. Additionally, the trial court held that Dr. Traub's negligence in caring for Plaintiff likewise constituted an independent intervening cause of any injuries Plaintiff may have sustained after her 1989 visit to his office.

## II. STANDARD OF REVIEW

■ 7. On a motion to dismiss made at the close of a plaintiff's case-in-chief in a nonjury trial, "the trial court weighs the evidence and gives to it such weight as the court believes it deserves." *See Worthey v. Sedillo Title Guar., Inc.*, 85 N.M. 339, 341, 512 P.2d 667, 669 (1973). "On appeal, review of such a dismissal is limited to whether the trial court's findings are supported by substantial evidence." *Balboa Constr. Co. v. Golden*, 97 N.M. 299, 301, 639 P.2d 586, 588 (Ct.App.1981). "The judgment of the trial court will not be disturbed on appeal if the findings of fact entered by the court are supported by substantial evidence, are not clearly erroneous, and are sufficient to support the judgment." *Camino Real Mobile Home Park Partnership v. Wolfe*, 119 N.M. 436, 441, 891 P.2d 1190, 1195 (1995). The trial court, sitting as fact finder, weighs the evidence, determines credibility of testimony, and resolves factual conflicts. *See Mascarenas v. Jaramillo*, 111 N.M. 410, 412, 806 P.2d 59, 61 (1991).

## III. DISCUSSION

■ 8. Initially, we reject Defendant's contention that Plaintiff waived her challenge to the trial court's findings because the brief-in-chief fails to identify with particularity the challenged findings and fails to summarize all of the evidence bearing on these findings, contrary to SCRA 1986, 12–213(A)(3)(Repl.1992). The trial court entered extensive findings. Most of these findings simply provided a chronology of events. Although Plaintiff's brief does not specify by number all of the findings she is attacking, it is clear that she is challenging the ultimate findings of fact regarding strict liability and negligence, and her brief adequately summarizes the evidence relevant to these findings. *See Thomas v. City of Santa Fe*, 112 N.M. 456, 459, 816 P.2d 525, 528 (Ct.App.), *cert. denied*, 112 N.M. 308, 815 P.2d 161 (1991). We therefore proceed to address the merits of Plaintiff's issues.

### A. Strict Liability

9. This is the third case before this Court involving an attempt to impose strict liability for injuries caused by Vitek TMJ implants. In *Parker v. E.I. Du Pont De Nemours &*

Co., 121 N.M. 120, 909 P.2d 1 (Ct.App.1995) (*Parker I*), the plaintiff sought to impose strict liability on the manufacturer of chemical substances (teflon) used in Vitek's production of Proplast, the component of the implants. We concluded in *Parker I* that the plaintiff failed to establish that the teflon was inherently defective or unsafe when it left the manufacturer's control. *Id.* at 126, 909 P.2d at 7. More recently, in *Parker v. St. Vincent Hospital,* 122 N.M. 39, 919 P.2d 1104 (Ct.App.1996) (*Parker II*), we considered whether strict liability should be imposed on a hospital supplying Vitek implants selected by the treating physician. We noted that the weight of authority holds that such liability not be imposed because hospitals generally provide services and are therefore not distributors or suppliers of products as contemplated under strict liability law. *Id.* at 41, 919 P.2d at 1106. We rejected this rationale as a legal fiction, choosing instead to view the issue in the context of the public policy goals underlying strict liability. *Id.*

10. Specifically, we looked to the four primary policies enunciated in *Brooks v. Beech Aircraft Corp.,* 120 N.M. 372, 377, 902 P.2d 54, 59 (1995) for imposing strict liability. *Id.* at 42, 919 P.2d at 1107. First, we considered the policy goal of incorporating the costs of injuries as part of the "true cost" of a defective product. *Parker II* concluded that this policy was attenuated in the context of non-manufacturer distributors because manufacturers indemnify distributors for any design defects, and it is unlikely, given the overall liability scheme, that any added costs would trace their way back to the product. *Id.* at 43, 919 P.2d at 1108. *Parker II* likewise concluded that the second policy goal identified in *Brooks,* to relieve an injured party of the burden of proving a manufacturer's negligence, had little force in the context of non-manufacturers who do not alter the product and therefore could not be culpable for negligent design. *Id.* at 43–44, 919 P.2d at 1108–09. With respect to the policy of providing protection throughout the chain of supply, we concluded that there was a strong contrary public policy where medical products are involved. *Id.* at 44, 919 P.2d at 1109. Finally, we observed that the fourth policy rationale

identified in *Brooks*—fairness—was a composite of the above policy goals and weighed in the hospital's favor because the physician, not the hospital, had selected the implants.

■ 11. We conclude in this appeal that our public-policy analysis of non-manufacturer distributor liability in *Parker II* is controlling in this case and weighs against imposition of strict liability. Although Defendant selected the implants in question, we believe that the policies identified in *Brooks,* with the possible exception of fairness, would not be advanced by imposing strict liability here for the same reasons that they would not be advanced if imposed on a hospital. Because we find the analysis in *Parker II* to be dispositive on this issue, we do not deem it necessary to review the cases cited to us in the parties' briefs, although we note that, like the refusal to impose strict liability on hospitals, the weight of authority is that such liability will not be imposed on physicians. *See Rolon–Alvarado v. Municipality of San Juan,* 1 F.3d 74, 79 n. 5 (1st Cir.1993) ("[I]t is hornbook law that a health-care provider cannot be held strictly liable for a latent defect in a medical device manufactured by a third party.").

### B. Negligence

#### 1. Overview

■ 12. Plaintiff does not contend that Defendant was negligent when he inserted the implants in 1983 or when he assumed care for their removal in 1993 and 1994. She argues instead that, at some point before the 1990 and 1991 Vitek and FDA alerts, Defendant should have contacted her concerning the dangers posed by the implants. She also argues that Defendant's efforts to contact her when the alerts did appear fell below the requisite standard of care. In reviewing Plaintiff's contentions, we take note that she had the burden at trial to prove that: (1) Defendant owed Plaintiff a legally-recognized duty; (2) Defendant breached this duty; and (3) the breach proximately caused Plaintiff's injuries. *See Blauwkamp v. University of N.M. Hosp.,* 114 N.M. 228, 231, 836 P.2d

1249, 1252 (Ct.App.), *cert. denied,* 114 N.M. 82, 835 P.2d 80 (1992).

13. In the absence of legislative directive, courts must decide as a matter of policy whether or not to recognize a duty under a given circumstance. *See Torres v. State,* 119 N.M. 609, 612, 894 P.2d 386, 389 (1995). No New Mexico cases have examined the duty issue in the context of a medical malpractice action where the plaintiff does not claim that the original procedure was negligently performed, but predicates negligence exclusively on the failure to warn of dangers discovered after the medical procedure. However, the parties do not dispute that a duty to use reasonable care under such circumstances exists. Support is found in *Kern ex rel. Kern v. St. Joseph Hospital, Inc.,* 102 N.M. 452, 697 P.2d 135 (1985), a case that examined subsequently discovered medical information in the context of tolling the statute of limitations under a fraudulent concealment theory. Addressing the defendant's claim that the physician did not have a duty to disclose information that came to light after the plaintiff was no longer his patient, our Supreme Court stated: "[W]e see no reason to restrict artificially a physician's liability by having his affirmative duty to disclose end with the termination of the fiduciary relationship." *Id.* at 456, 697 P.2d at 139. A logical extension of *Kern* is that we should recognize a duty to use reasonable care in an action where the failure to warn serves as the predicate allegation of negligence. *See Tresemer v. Barke,* 86 Cal. App.3d 656, 150 Cal.Rptr. 384, 392–94 (2nd Dist.1978); *see generally* Andrea G. Nadel, *Duty of Medical Practitioner to Warn Patient of Subsequently Discovered Danger From Treatment Previously Given,* 12 A.L.R. 4th 41 (1982).

14. As recognized by the parties and the trial court, however, the central issue in this case is not whether Defendant *owed* a duty to exercise reasonable care as information became known later, but whether Defendant *breached* the duty or applicable standard of care. Breach is an issue for the fact finder unless no reasonable minds could differ. *See New Mexico State Highway Dep't v. Van Dyke,* 90 N.M. 357, 360, 563 P.2d 1150, 1153 (1977). In a medical malpractice action, a plaintiff is required to establish breach through expert medical testimony unless the fact finder can resort to common knowledge. *See Pharmaseal Lab., Inc. v. Goffe,* 90 N.M. 753, 758, 568 P.2d 589, 594 (1977). Here, Plaintiff attempted to establish breach through Defendant's own testimony, *see Mascarenas v. Gonzales,* 83 N.M. 749, 752, 497 P.2d 751, 754 (Ct.App.1972) (negligence of doctor may be established through his own testimony), as well as Dr. Traub's opinion testimony. We now proceed to review this testimony.

### 2. Testimony

#### a. Defendant

15. Defendant testified that Proplast was showing a 93–97% success rate at the time of Plaintiff's initial surgery. Before surgery, Defendant discussed with Plaintiff the nature of the procedure and informed her that her pain may never go away. He told her that the implant could break up, that it was incapable of regeneration, and that anything that is incapable of regeneration can deteriorate. After Plaintiff's surgery, none of the major problems Defendant discussed with Plaintiff at the informed consent meeting occurred. At the time of the last visit, however, he recommended continued follow-up care. Defendant stated that he saw 1400 patients a year, and, as a result, he could not be a "babysitter" for their appointments.

16. Defendant removed Vitek implants from two of his patients in March (before Plaintiff's last visit) and June 1984. He clinically observed that these patients were getting good results initially but that their erosion problems and pain would return. By the end of 1985, he had removed fifteen implants, constituting a 60% failure rate. At this time, he determined he would no longer use these implants in his patients. The problems he experienced with the implants occurred within the first or second year after surgery, after which time the situation had stabilized.

17. Discussing his failure rate, Defendant testified that "there were arguments out there, there were people seeing problems, I

happened to be one who did not want to place [the implants] anymore; I did not have the backup of the literature on that but I felt that in my hands I was not seeing the results I wanted." In 1987, Defendant again experienced problems with one of his patients and sent a letter to the Mayo Clinic requesting assistance on a diagnosis. He still did not know, however, that the defective nature of the Proplast was the cause of the implant's problems: "What I'm trying to say is I have not yet realized that Proplast will create the problem.... The literature also didn't recognize this.... They are still blaming it on the detriment of the teflon. They are not talking about Proplast by itself will create problems in a joint without movement. Until [the Vitek/FDA alerts] came out nobody knew that. That was not in the literature."

18. When asked why he had not attempted to contact Plaintiff after her April 1984 visit, Defendant responded that he advised her during this visit to see Dr. Jameson for a splint, and he assumed that she was treated by Dr. Jameson. When Vitek issued the first safety alert in 1990, Defendant informed his front desk to send it to all of his patients who had implants. Plaintiff was on the mailing list in 1990 and his office assumed that she was reached because the letter was never returned. In October 1991, his office sent an FDA recall notice to Plaintiff and it was returned as undeliverable. Defendant's office assumed that there had been a change of address between 1990 and 1991 because the earlier mailing had not been returned. As a result, his office attempted to contact her at her last known address, listed as the Red River Fish Hatchery on her 1983 intake form and was told she had moved and no one at the fish hatchery knew her new address. He was told by his staff that they went through the records and had used all the abilities that they could have used to contact her.

### b. Dr. Traub

19. Dr. Traub testified that he had not used Vitek implants in his practice because he had been advised in the early 1980s by an orthopedic surgeon that the use of teflon-containing-materials was fraught with considerable difficulties. When asked what was occurring with respect to knowledge surrounding use of the Vitek implants in the mid–1980s, Dr. Traub responded: "Poor results. Failed cases. Patients requiring repeated surgical endeavors." He stated that his information came from a number of sources, seminars, and medical literature. When asked what he would have told a patient regarding Vitek implants in 1985 and 1986 based on information available to him at that time, he answered: "Basically that there were serious questions with regard to their long term stability, that the treatment results were questionable, and that there was a high rate of failure."

20. Dr. Traub also testified that the standard of care in the medical community was defined by common sense. As applied to implants, Dr. Traub stated that at the time you recognize the material "you are using is causing an inordinate amount of complications, it is time for you to inform your patients," independent of any organizational or FDA directives. He also stated that clinical observations were of "utmost importance." Reasonable efforts to inform patients included routine follow-up care, certified letters, phone calls, and contacting family.

21. Based on the growing evidence of problems with the Vitek implants, Dr. Traub opined that Defendant fell below the standard of care in failing to attempt contacting Plaintiff before the 1990 and 1991 alerts. He also stated that Defendant's efforts to locate Plaintiff when the alerts were issued were inadequate. Dr. Traub apparently believed that Defendant should have contacted either Plaintiff's mother or another individual whose addresses and phone numbers appeared in Defendant's records. Dr. Traub conceded, however, that he "blew" his 1989 diagnosis when he failed to fully inquire into Plaintiff's TMJ surgery and failed to see Plaintiff's implants on her x-ray. He again missed the implants on Plaintiff's 1991 x-ray due to his "lack of experience with the material." When asked why he didn't contact Plaintiff after she failed to return for her follow-up visits, given the fact that he knew she was symptomatic, Dr. Traub responded: "It was her responsibility to come back." When asked why he was not board certified

by the American Board of Oral and Maxillo-facial Surgeons, he blamed this as "payback" for his outspokenness in the oral surgeon community. Finally, Dr. Traub conceded that he had used Vitek products (not implants) as late as 1988.

### 3. Analysis

22. Initially, we address Plaintiff's concerns that the trial court mistakenly concluded Dr. Traub was not qualified to testify as an expert concerning the applicable standard of care to warn patients of information discovered after a medical procedure. Plaintiff argues that no expert testimony was required because Defendant's departure from the requisite standard of care in the case could be determined by resort to common knowledge. *See Pharmaseal,* 90 N.M. at 758, 568 P.2d at 594. We believe that Plaintiff has misconstrued the trial court's ruling in this regard. Our review of the taped trial proceedings indicates that, although the trial court initially questioned whether Plaintiff satisfied the foundational requirements for Dr. Traub's testimony, Dr. Traub was ultimately allowed, over Defendant's objections, to testify on these issues. Nor are there any findings indicating the trial court rejected this testimony on foundation grounds. Instead, the court simply chose not to believe the substance of the testimony.

23. We believe the testimony noted above shows that the trial court reasonably determined Plaintiff failed to meet her burden that Defendant breached the applicable standard of care. *See Lopez v. Adams,* 116 N.M. 757, 758, 867 P.2d 427, 428 (Ct.App. 1993) ("If a finding is made against the party with the burden of proof, we can affirm if it was rational for the trial court to disbelieve the evidence offered by that party."), *cert. denied,* 116 N.M. 801, 867 P.2d 1183 (1994). Specifically, Defendant's testimony established that, although there was mounting evidence against the safety of the Vitek implants throughout the 1980s, it was not known until the safety alerts were issued that the Proplast material itself was to blame. This fact is important because, up until that time, it was reasonable for Defendant to conclude that the implants them-selves were not inherently defective and that the success or failure with a given patient could be attributed to other causes, such as surgical technique or movement of the implant over time. As such, it was reasonable for Defendant to assume that Plaintiff was not experiencing problems because she did not return to his office, as she was advised to do should she have problems.

24. It was also reasonable for the trial court to disbelieve Dr. Traub's testimony that Defendant breached his duty. The trial court could have determined that Dr. Traub's failure to identify the implants on the 1989 and 1991 x-rays and his failure to investigate the nature of Plaintiff's TMJ surgery undermined his testimony that he and other physicians would have acted with a greater degree of care than that exercised by Defendant. Although Defendant's 60% failure rate was alarming on its face, the trial court could reasonably rely on Defendant's additional testimony that the problems he experienced with these patients surfaced shortly after their surgery and, as a result, it was reasonable to assume that Plaintiff was asymptomatic.

25. It was also reasonable for the trial court to disbelieve Plaintiff's assertion that Defendant's efforts in 1990 and 1991 to locate Plaintiff were inadequate. It was reasonable to assume that Plaintiff received the 1990 alert because the letter was not returned. When the 1991 alert was returned, Defendant's staff attempted to reach her at the Red River Fish Hatchery and was told that no one knew where she was.

26. There is some ambiguity in the record concerning Defendant's access to the telephone numbers and addresses of Plaintiff's mother, Veena Roybal, and a friend, Juanita Wilkenson, either of whom Plaintiff claims could have contacted her. Roybal and Wilkenson were not listed on Plaintiff's March 1993 intake sheet. Although Defendant's office records contained a 1983 hospital admission form bearing this information, it is unclear whether this information was in the file in 1990 and 1991 or was inserted as an update when Plaintiff underwent surgery in 1994.

27. Additionally, Plaintiff's claim rests entirely on evidence that these individuals had not been contacted. Defendant's testimony indicates that his staff made full use of the records to contact Plaintiff. The mere fact that Roybal and Wilkenson were not contacted does not conclusively establish that no effort was made to contact them. Because Plaintiff had the burden of proof at trial, she had to show that these staff members had in fact failed to make any efforts to contact Plaintiff's mother or her friend. Even if Roybal and Wilkenson's names and telephone numbers were in Plaintiff's file in 1990 and 1991 and the evidence also showed that no effort was made to contact them, we believe that the trier-of-fact was free to consider this evidence together with all other evidence to resolve the issue of breach. As a reviewing court, we do not substitute our judgment for the trial court as fact finder in a bench trial. *Clayton v. Trotter*, 110 N.M. 369, 372, 796 P.2d 262, 265 (Ct.App.1990).

28. Again, we agree that more steps might have been taken to locate Plaintiff, but this factor was most likely considered by the trier-of-fact in the context of Defendant's advice to Plaintiff to return if she began to experience problems. In other words, the trial court could have determined that it would be reasonable to assume that the efforts to locate Plaintiff did not have to exceed those taken because Plaintiff would return to see Defendant or another physician if her implants began to fail. Although the evidence presented by Plaintiff was sufficient to sustain a finding to the contrary, we are compelled under our standard of review to affirm the trial court's determination that Defendant did not breach his duty or the applicable standard of care. *See Abbinett v. Fox*, 103 N.M. 80, 86, 703 P.2d 177, 183 (Ct.App.) ("The test to be applied on appeal is whether or not there is substantial evidence to support the trial court's findings, not whether there is evidence to support an alternative result."), *cert. quashed*, 103 N.M. 62, 702 P.2d 1007 (1985).

## IV. CONCLUSION

29. We hold that a physician may not be held strictly liable as a matter of policy for the use of a manufactured implant later shown to be defective. We also hold that a physician has a duty to warn a patient of information obtained following a medical procedure. Under the facts of this case, however, it was reasonable for the trial court, sitting as fact finder, to conclude that Plaintiff had failed to meet her burden of proof that Defendant breached his duty. In light of our disposition, we need not reach Plaintiff's issues concerning independent intervening cause. We affirm the trial court's judgment dismissing Plaintiff's complaint. The parties shall bear their own costs on appeal.

30. IT IS SO ORDERED.

ALARID and FLORES, JJ., concur.