Hillsborough-northern judicial district
No. 98-060

## IRA A. AND RACHEL M. ROYER

v.

## CATHOLIC MEDICAL CENTER

November 23, 1999

*Abramson, Reis, Brown & Dugan*, of Manchester (*John P. Fagan* and *Jared R. Green* on the brief, and *Mr. Green* orally), for the plaintiffs.

*Nelson, Kinder, Mosseau & Gordon, P.C.*, of Manchester (*Robert M. Daniszewski* and *Gordon J. MacDonald* on the brief, and *Mr. Daniszewski* orally), for the defendant.

BROCK, C.J. The plaintiffs, Ira A. and Rachel M. Royer, appeal from an order of the Superior Court (*Sullivan*, J.) granting a motion to dismiss in favor of the defendant, Catholic Medical Center (CMC). We affirm.

The plaintiffs have pleaded the following facts. In September 1991, Ira Royer underwent total knee replacement surgery at CMC. As part of the procedure, a prosthetic knee, provided by CMC, was surgically implanted. In April 1993, Royer complained to his doctor that the pain in his knee was worse than it had been before the surgery. His doctors determined that the prosthesis was defective, and in June 1993 Royer underwent a second operation in which the prosthesis was removed, and a second prosthesis inserted.

Ira Royer initially brought suit against Dow Corning Corp., Dow Corning Wright, Inc., and Wright Medical Technologies, Inc., the companies that had allegedly designed and manufactured the defective prosthesis. Subsequently, Dow Corning commenced federal bankruptcy proceedings, and the plaintiffs filed a second writ against CMC, alleging that CMC was strictly liable to Ira because it had sold a prosthesis with a design defect that was in an unreasonably dangerous condition, and liable to Rachel who suffered a loss of consortium.

The defendant moved to dismiss, arguing, *inter alia*, that it was not a "seller of goods" for purposes of strict products liability, and that absent the strict liability claim, the loss of consortium claim could not stand. The trial court granted the motion, finding that CMC was not, as a matter of law, engaged in the business of selling prosthetic devices. On appeal, the plaintiffs contend that this finding was error.

> In reviewing an order on a motion to dismiss for failure to state a claim upon which relief may be granted, we ask whether the plaintiffs' allegations are reasonably susceptible of a construction that would permit recovery. We assume the truth of the plaintiffs' well pleaded allegations of fact and construe all reasonable inferences from them most favorably to the plaintiffs.

*Hacking v. Town of Belmont*, 143 N.H. 546, 549, 736 A.2d 1229, 1232 (1999) (quotations, citation, and brackets omitted).

In New Hampshire, "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to [strict] liability for physical harm thereby caused" if, *inter alia*, "the seller is engaged in the business of selling such a product." RESTATEMENT (SECOND) OF TORTS

§ 402A (1965); *see Buttrick v. Lessard,* 110 N.H. 36, 38-39, 260 A.2d 111, 113 (1969) (adopting RESTATEMENT (SECOND) OF TORTS § 402A). If the defendant merely provides a service, however, there is no liability absent proof of a violation of a legal duty. *See Siciliano v. Capitol City Shows, Inc.,* 124 N.H. 719, 730, 475 A.2d 19, 25 (1984). In this case, we are asked to determine whether a health care provider that supplies a defective prosthesis in the course of delivering health care services is a "seller" of prosthetic devices, or is merely providing a professional service.

In deciding this issue of first impression, we are guided by the principles that have supported the development of a cause of action for strict liability in New Hampshire. "Strict liability for damages has traditionally met with disfavor in this jurisdiction." *Bruzga v. PMR Architects,* 141 N.H. 756, 761, 693 A.2d 401, 404-05 (1997) (quotation and brackets omitted). As a general rule, "strict liability is available only where the Legislature has provided for it or in those situations where the common law of this state has imposed such liability and the Legislature has not seen fit to change it." *Id.* at 761, 693 A.2d at 405 (quotation omitted).

> The reasons for the development of strict liability in tort were the lack of privity between the manufacturer and the buyer, the difficulty of proving negligence against a distant manufacturer using mass production techniques, and the better ability of the mass manufacturer to spread the economic risks among consumers.

*Id.* (quotation omitted). Particularly crucial to our adoption of strict liability in the context of defective products was the practical impossibility of proving legal fault in many products liability cases. *See Bagley v. Controlled Environment Corp.,* 127 N.H. 556, 560, 503 A.2d 823, 826 (1986).

Although we have adopted a cause of action for strict products liability, we have recognized limits to the doctrine. *See Thibault v. Sears, Roebuck & Co.,* 118 N.H. 802, 807, 395 A.2d 843, 846 (1978). In *Bruzga,* we rejected an argument that strict liability should extend to architects and building contractors who allegedly designed and "manufactured" a defective building. *See Bruzga,* 141 N.H. at 761-63, 693 A.2d at 404-06. After determining that the reasons supporting strict liability did not apply to architects and contractors, we concluded that architects and contractors provide a professional service. *See id.* at 761- 62, 693 A.2d at 405. Although we acknowledged that a building contractor "supplies" a structure to

the purchaser, we declined to extend strict products liability to contractors because they are "engaged primarily in the rendition of a service." *Id.* at 762, 693 A.2d at 405-06 (quotation omitted).

A majority of the jurisdictions that have addressed whether a health care provider who supplies a defective prosthesis is subject to strict liability have declined to extend strict liability, similarly reasoning that the health care provider primarily renders a service, and that the provision of a prosthetic device is merely incidental to that service. *See, e.g., Cafazzo v. Cent. Medical Health Services*, 668 A.2d 521, 524-25 (Pa. 1995); *In re Breast Implant Product Liability*, 503 S.E.2d 445, 448-51 (S.C. 1998). *See generally* Annotation, *Liability of Hospital or Medical Practitioner under Doctrine of Strict Liability in Tort, or Breach of Warranty, for Harm Caused by Drug, Medical Instrument, or Similar Device used in Treating Patient*, 65 A.L.R. 5TH 357, 387-96 (1999) (collecting cases). *But see Mulligan v. Truman Medical Center*, 950 S.W.2d 576, 582-83 (Mo. Ct. App. 1997); *Bell v. Poplar Bluff Physicians Group*, 879 S.W.2d 618, 619-21 (Mo. Ct. App. 1994); *Parker v. St. Vincent Hosp.*, 919 P.2d 1104, 1107 (N.M. Ct. App. 1996) (rejecting products/services distinction, but declining to extend strict liability on policy grounds). The defendant urges us to adopt this rationale.

The plaintiffs argue, however, that the distinction between selling products and providing services is a legal fiction. The defendant, according to the plaintiffs, acted both as a seller of the prosthetic knee and as a provider of professional services in the transaction. Because the defendant charged separately for the prosthesis and earned a profit on the "sale," the plaintiffs argue that the defendant should be treated no differently than any other distributor of a defective product. The defendant, according to the plaintiffs, primarily supplied a prosthesis, while the surgeon provided the professional "services."

Although a defendant may both provide a service and sell a product within the same transaction for purposes of strict liability, *see* RESTATEMENT (SECOND) OF TORTS § 402A, comment f at 350; *cf. Bolduc v. Herbert Schneider Corp.*, 117 N.H. 566, 570, 374 A.2d 1187, 1189 (1977), the dispositive issue in this case is not whether the defendant "sold" or transferred a prosthetic knee, but whether the defendant was an entity "engaged in the business of selling" prosthetic knees so as to warrant the imposition of liability without proof of legal fault. "[T]he language of 402A, . . . as with other non-statutory declarations, is a common law pronouncement by the court, which always retains the right and the duty to test the reason behind a common law rule in determining the applicability of such a

rule to the facts before it." *Cafazzo,* 668 A.2d at 523 (quotation omitted). We find the reasoning of both *Bruzga* and the majority of courts that have declined to extend strict liability to health care providers who supply defective prostheses to be persuasive.

"The essence of the relationship between hospital and patient is the provision of professional medical services necessary to effectuate the implantation of the [prosthesis] . . . ." *Hector v. Cedars-Sinai Medical Center,* 225 Cal. Rptr. 595, 599 (Ct. App. 1986). "[T]he patient bargains for, and the hospital agrees to make available, the human skill and physical materiel of medical science to the end that the patient's health be restored." *Perlmutter v. Beth David Hospital,* 123 N.E.2d 792, 794 (N.Y. 1954). That the hospital charges a fee for the prosthesis and transfers possession does not transform the character of the hospital-patient relationship. "The thrust of the inquiry is thus not on whether a separate consideration is charged for the physical material used in the exercise of medical skill, but what service is performed to restore or maintain the patient's health." *Cafazzo,* 668 A.2d at 524; *see also Hector,* 225 Cal. Rptr. at 600.

We cannot agree that this distinction is merely a legal fiction. "[T]he essence of the transaction between the retail seller and the consumer relates to the article sold. The seller is in the business of supplying the product to the consumer. It is that, and that alone, for which he is paid." *Hoff v. Zimmer, Inc.,* 746 F. Supp. 872, 875 (W.D. Wis. 1990) (quotation omitted) (construing Wisconsin law). A patient, by contrast, does not enter a hospital to "purchase" a prosthesis, "but to obtain a course of treatment in the hope of being cured of what ails him." *Perlmutter,* 123 N.E.2d at 796. Indeed, "to ignore the ancillary nature of the association of product with activity is to posit surgery, or . . . any medical service requiring the use of a physical object, as a marketing device for the incorporated object." *Cafazzo,* 668 A.2d at 524.

We decline to ignore the reality of the relationship between Ira Royer and CMC, and to treat any services provided by CMC as ancillary to a primary purpose of selling a prosthetic knee. Rather, the record indicates that in addition to the prosthesis, Royer was billed for a hospital room, operating room services, physical therapy, a recovery room, pathology laboratory work, an EKG or ECG, X rays, and anesthesia. Thus, it is evident that Ira Royer entered CMC not to purchase a prosthesis, but to obtain health care services that included the implantation of the knee, with the overall objective of restoring his health. *See St. Mary Medical Center, Inc. v. Casko,* 639 N.E.2d 312, 315 (Ind. Ct. App. 1994). Necessary to the

restoration of his health, in the judgment of his physicians, was the implantation of the prosthesis. We do not find this scenario, as the plaintiffs urge, analogous to one in which a plaintiff purchases a defective tire from a retail tire distributor and has the distributor install the tire. *Cf. Perlmutter*, 123 N.E.2d at 795-96.

Moreover, the policy rationale underlying strict liability, as in *Bruzga*, does not support extension of the doctrine under the facts of this case. With respect to the inherent difficulty of proving negligence in many products liability cases, this rationale fails in the context of non-manufacturer cases alleging a design defect. Because "ordinarily there is no possibility that a distributor other than the manufacturer created a design defect[,] . . . strict liability would impose liability when there is no possibility of negligence." *Parker*, 919 P.2d at 1108-09. The plaintiffs do not allege in this case that the defendant altered the prosthesis in any way. Further, holding health care providers strictly liable for defects in prosthetic devices necessary to the provision of health care would likely result in higher health care costs borne ultimately by all patients, *see Ayyash v. Henry Ford Health Systems*, 533 N.W.2d 353, 355 (Mich. Ct. App. 1995); *Parker*, 919 P.2d at 1108; *Cafazzo*, 668 A.2d at 527, and "place an unrealistic burden on the physicians and hospitals of this state to test or guarantee the tens of thousands of products used in hospitals by doctors," *Ayyash*, 533 N.W.2d at 356; *see Parker*, 919 P.2d at 1110. Additionally, "research and innovation in medical equipment and treatment would be inhibited." *Cafazzo*, 668 A.2d at 527; *see Hoff*, 746 F. Supp. at 874-75. We find that the "peculiar characteristics of medical services[,] . . . [which] include the tendency to be experimental, . . . a dependence on factors beyond the control of the professional[,] and a lack of certainty or assurance of the desired result," *Cafazzo*, 668 A.2d at 527, outweigh any reasons that might support the imposition of strict liability in this context.

■ "In short, medical services are distinguished by factors which make them significantly different in kind from the retail marketing enterprise at which 402A is directed." *Id*. We conclude that where, as here, a health care provider in the course of rendering health care services supplies a prosthetic device to be implanted into a patient, the health care provider is not "engaged in the business of selling" prostheses for purposes of strict products liability. Accordingly, the trial court did not err in granting the defendant's motion to dismiss.

Because we have concluded that the trial court did not err in finding that the defendant was not engaged in the business of selling

prosthetic devices, we need not address its alternative ground for affirming the trial court. We have considered the remaining arguments of the plaintiffs and find them under the circumstances of this case to be without merit, warranting no further discussion. *See Vogel v. Vogel*, 137 N.H. 321, 322, 627 A.2d 595, 596 (1993).

*Affirmed.*

All concurred.