2001-NMCA-090

33 P.3d 638

Patrick Glenn SMITH and Jeanne Louise Smith, individually and as natural parents and next of kin of Sean Patrick SMITH, Plaintiffs–Appellants,

v.

BRYCO ARMS, Jennings Firearms, Inc., (NV), a/k/a B.L. Jennings and Jennings Firearms, Inc., (CA), Defendants–Appellees.

No. 20,389.

Court of Appeals of New Mexico.

July 27, 2001.

Michael G. Rosenberg, Rosenberg & Associates, P.C., Albuquerque, NM, Brian J. Siebel, Center to Prevent Handgun Violence, Washington, DC, for Appellants.

Sally Ann Hagan, J.D. Behles & Associates, a Commercial Law Firm, P.C., Albuquerque, NM, for Appellees.

*OPINION*

BUSTAMANTE, Judge.

{1} In this case we consider, under theories of strict products liability and negligence, the liability of the manufacturer and distributor of a .22 caliber handgun, referred to as the J–22, for the accidental shooting of an Albuquerque boy, 14–year–old Sean Smith (Sean), by his 15–year–old friend D.J. Valencia (D.J.). The trial court granted summary judgment to the gun manufacturer, Defendant Bryco Arms (Bryco), and to the gun distributor, Defendant Jennings Firearms, Inc. (NV), a/k/a B.L. Jennings and Jennings Firearms Inc. (CA) (Jennings).

{2} Plaintiff raises strict products liability and negligence theories of recovery against Bryco and Jennings. Both theories are predicated upon the fact that the J–22 handgun does not incorporate a "magazine-out safety," a "chamber load indicator," or a written warning on the gun itself alerting users that the J–22 can fire even though the magazine has been removed. The issues on appeal are (1) whether the court erred in ruling that, as a matter of law, Bryco and Jennings were not negligent because they had no duty to incorporate the safety features described above; (2) whether the trial court erred in ruling that, as a matter of law, the J–22 does not present an unreasonable risk of injury for purposes of strict product liability; and (3) whether Plaintiff came forward with evidence sufficient to raise a genuine issue of material fact that the failure to incorporate the above safety features was a proximate cause of Sean's injury. We reverse and remand.

**FACTUAL AND PROCEDURAL BACKGROUND**

{3} The shooting occurred on January 29, 1993, at Sean's house. No parents were home at the time. Sean, Michael Brummett (Michael) age 15, and Brian Romero (Brian) age 16, were at Sean's house. The three boys decided to go out to get some food. While they were out, Michael legally purchased the J–22 handgun and ammunition for $40 from an individual identified only as Bernard. The sale occurred in a parking lot in Albuquerque. While purchasing the gun, Michael examined the chamber and saw it was empty and asked to see the ammunition magazine. Michael inserted the magazine into the gun and purchased it. The three boys examined the gun in the car. When they got back to Sean's house, the boys again

examined the gun. Michael put the gun and magazine clip in his jacket, brought it into the house, and took the gun with him into the bathroom. At some point, Sean also called D.J. to come over. Michael removed the magazine and kept it with him in the bathroom while the other boys passed the gun around in the livingroom. Sean, D.J., and Brian testified that they thought the gun was unloaded and would not fire with the magazine out. The boys testified that they did not realize that a bullet might remain in the chamber even though the magazine had been removed. When the gun was passed to D.J., he "stupidly" pulled the trigger and unintentionally shot Sean as Sean was talking on the telephone, hitting him in the mouth and seriously injuring him.

{4} Sean and his parents, Patrick and Jeanne Smith (Plaintiffs), initially filed a complaint to recover damages for personal injury, alleging that the parents of D.J., Michael, and Brian were negligent for failing to supervise the boys properly. The complaint was then amended to name the three boys and their parents, alleging negligence of minors, negligence as a matter of law, vicarious parental liability, and parental negligence. The complaint was amended a second time to add Bryco, the manufacturer of the J–22, and Jennings, the distributor of the J–22. The second amended complaint alleged that Bryco and Jennings were liable in strict products liability and negligence for manufacturing and distributing a product defective because of inadequate warnings and their failure to incorporate feasible safety devices into the design of the J–22 gun that would have prevented Sean's injuries. The claims against the minors and their parents were settled, leaving Bryco and Jennings as Defendants.

{5} Bryco and Jennings filed separate motions for summary judgment. After full briefing and a hearing, the trial court issued a Decision Letter and granted summary judgment in favor of Defendants. The Decision Letter reads as follows:

> As a matter of law I do not think that Defendants were either negligent in the manufacture of the gun, nor do I think they are liable under strict products liability. It is not alleged that the gun in ques-

tion had a defect which caused the injury. The gun operated exactly as designed. Handguns are intended and designed to be deadly weapons. The fact that they are capable of being misused, and are in fact often misused, does not render them defective.

> This lawsuit against gun manufacturers is another attempt to outlaw or severely restrict the manufacture of a product using the tort law. In my opinion such efforts are better left to the legislative branch of government. If the legislature wants to require all manner of safety devices or warnings they may do so. It should not be for the courts and juries to make that law on a case by case manner. If this is a case for extending the tort law, it should not be done by this Court. A significant change in the law, as is advocated by Plaintiffs in this lawsuit, should be made, if at all, by the Supreme Court.

## STANDARD OF REVIEW

{6} If the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law, then summary judgment should be granted. Rule 1–056(C) NMRA 2001; *Paca v. K–Mart Corp.*, 108 N.M. 479, 480, 775 P.2d 245, 246 (1989). Summary judgment, however, is a drastic measure that should be used with caution. *Knapp v. Fraternal Order of Eagles*, 106 N.M. 11, 12, 738 P.2d 129, 130 (Ct.App.1987). "In deciding whether summary judgment is proper, a court must look to the whole record and view the matters presented in the light most favorable to support the right to trial on the merits." *Cunningham v. Gross*, 102 N.M. 723, 725, 699 P.2d 1075, 1077 (1985). We review questions of law de novo. *Self v. United Parcel Serv., Inc.*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582.

## DISCUSSION

{7} As reflected in its Decision Letter, the trial court applied a restrictive definition of defect. In the trial court's view, a defect

consisted of a flaw in the fabrication of the particular J–22 involved in this case. The trial court reasoned that here, the J–22 functioned exactly as it was designed to do: when D.J. pointed the gun at Sean and pulled the trigger, the J–22 fired. Thus, under the trial court's restrictive definition of defect, the J–22 was not defective. The trial court relied on Plaintiffs' failure to show a manufacturing defect which resulted in a malfunction.

{8} The trial court's unwillingness to consider possible design and warning defects sidestepped the true gravamen of the Plaintiffs' case: that the gun as designed was defective because it did not incorporate available and economically reasonable design features and warnings which would have prevented the shooting. *See Fernandez v. Ford Motor Co.,* 118 N.M. 100, 109, 879 P.2d 101, 110 (Ct.App.1994) ("Under Section 402A, there are three types of defects: manufacturing defects, design defects, and warning defects."). Apparently viewing the application of normal products liability and negligence concepts to handguns as a significant change in the law, the trial court deferred to our Supreme Court for action. Characterizing Plaintiffs' action as an attempt to "outlaw or severely restrict" the manufacture of guns, the trial court also opined that the legislature is the most appropriate forum for any remedy. We address this concern first and then consider whether our general products liability and negligence law adequately encompasses Plaintiffs' cause of action.

{9} The notion that the courts cannot speak in the area of products liability without legislative guidance has been considered and rejected by the New Mexico Supreme Court. In *Brooks v. Beech Aircraft Corp.,* 120 N.M. 372, 382, 902 P.2d 54, 64 (1995), for example, the Court explained that the standards for measuring strict liability and negligence are the general and traditional rules of relevance and materiality for all evidence upon which unreasonable risk of harm and negligence are to be decided, unless the legislature has preempted the application of these principles with specific statutory product requirements. As such, New Mexico courts have long held manufacturers and distributors responsible in strict liability or negligence for failing to include safety devices in their products. *Id.* at 383, 902 P.2d at 65 (failure to include shoulder harness in aircraft); *see also Cleveland v. Piper Aircraft Corp.,* 890 F.2d 1540, 1556 (10th Cir.1989) (failure to include rear seat visibility and shoulder harness); *Fabian v. E.W. Bliss Co.,* 582 F.2d 1257, 1260–61 (10th Cir.1978) (failure to include punch press guards); *Fernandez,* 118 N.M. at 109–12, 879 P.2d at 110–14 (failure to include back-up alarm on tractor and trailer); and *Salinas v. John Deere Co.,* 103 N.M. 336, 341, 707 P.2d 27, 32 (Ct.App.1984) (failure to include "corn saver" in combine).

■ {10} All parties in the chain of distribution of a defective product are strictly liable. *Parker v. St. Vincent Hosp.,* 1996–NMCA–070, ¶ 4, 122 N.M. 39, 919 P.2d 1104 ("Ordinarily, any entity engaged in the business of selling or otherwise distributing products is strictly liable for distributing a defective product."). Public policy factors based on safety concerns, economic realities, and fairness (discussed below) have defined the responsibilities of product suppliers. Existing case law has relied on these factors and defined the decision-making roles of judge and jury in this area. *See* UJI–13–1406 to –1419 NMRA 2001 (including committee commentary and case law cited thereunder).

{11} The trial court was perhaps concerned that applying our tort law to handguns could have the effect of infringing on the constitutional right to bear arms. N.M. Const. art. XI, § 6. We recognize that firearms are different than other products in the sense that they are the subject of a constitutional right. However, as the following discussion will demonstrate, we do not perceive anything so unique about handguns that they cannot or should not be subject to normal tort law concepts, norms, and methods of analysis. The distinctive aspects of handguns as a type of firearm can be reasonably accommodated and accounted for under our existing law without effectively "outlawing" or otherwise restricting handgun manufacture and sale. To the contrary, application of our tort law can be expected to enhance ownership by tending to increase the safety of handgun use.

## A. The Strict Products Liability Theory

{12} New Mexico adopted the principle of strict products liability based on the Restatement (Second) of Torts § 402A (1965) in *Stang v. Hertz Corp.*, 83 N.M. 730, 732, 497 P.2d 732, 734 (1972). " 'The purpose behind the strict products liability doctrine is to allow an injured user or consumer to recover against a supplier or manufacturer without the requirement of proving negligence.' " *Fernandez*, 118 N.M. at 109, 879 P.2d at 110 (quoting *Trujillo v. Berry*, 106 N.M. 86, 88, 738 P.2d 1331, 1333 (Ct.App. 1987)). The policy underpinnings supporting imposition of strict liability on product manufacturers and suppliers include (1) ensuring that the risk of loss for injury resulting from defective products is borne by the suppliers, principally because they are in a position to absorb the loss by distributing it as a cost of doing business; (2) encouraging suppliers to select reputable and responsible manufacturers who generally design and construct safe products and who generally accept financial responsibility for injuries caused by their defective products; and (3) promoting fairness by ensuring that plaintiffs injured by an unreasonably dangerous product are compensated for their injuries. *Brooks*, 120 N.M. at 375–76, 902 P.2d at 57–58.

{13} Under the strict products liability theory, a supplier of products is liable for harm proximately caused by an unreasonable risk of injury resulting from a condition of the product or from a manner of its use. *See* UJI 13–1406; *Fernandez*, 118 N.M. at 109, 879 P.2d at 110. This rule applies even though all possible care has been used by the supplier in putting the product on the market. *Id.* at 109, 879 P.2d at 110. The liability of the supplier is to persons the supplier can reasonably expect to use the product and to be in the vicinity during the use of the product. *See id.; see also* UJI 13–1403 and UJI 13–1406 (stating supplier has a duty to consider foreseeable risks of injury). An unreasonable risk of injury is a risk which a reasonably prudent person having full knowledge of the risk would find unacceptable. UJI 13–1407; *Fernandez*, 118 N.M. at 112, 879 P.2d at 113. Determining whether a product design poses an unreasonable risk of injury also involves considering whether the risk can be eliminated without seriously im-

pairing the usefulness of the product or making it unduly expensive. *Brooks*, 120 N.M. at 379–81, 902 P.2d at 61–63.

{14} Whether a product is unreasonably dangerous, and therefore defective, is ordinarily a question for the jury. *Fernandez*, 118 N.M. at 112, 879 P.2d at 113; *Salinas*, 103 N.M. at 341, 707 P.2d at 32. New Mexico's "unreasonable-risk-of-injury" test allows for proof and argument under any rational theory of defect. *Brooks*, 120 N.M. at 379, 902 P.2d at 61. The jury instructions covering strict products liability are designed to encourage a risk-benefit calculation by defining "unreasonable risk of injury" in a way which requires the jury to balance meritorious choices for safety made by the manufacturer while minimizing the risk that the public will be deprived needlessly of beneficial products. UJI 13–1407; *Brooks*, 120 N.M. at 379–80, 902 P.2d at 61–62. Under a strict liability theory, the jury assesses the supplier's design decisions according to a risk-benefit analysis rather than, or in addition to, its conduct (negligence) at the time of supply. *Id.* at 381, 902 P.2d at 63.

{15} For their strict liability claims, Plaintiffs allege that the J–22 handgun was in an unreasonably dangerous and defective condition because it (1) "[i]nadequately lacked a proper safety mechanism which would prevent the handgun from firing when the ammunition magazine was removed," (2) "was not designed so as to sufficiently warn foreseeable users when a round of ammunition has been loaded," and (3) lacked "a warning adequate to apprise all foreseeable users, especially minor users, of the fact that the handgun could fire a projectile even if the ammunition magazine were removed."

{16} We perceive nothing new or unusual in these theories of defect. They present straightforward assertions that the handgun could have—and therefore should have—incorporated long-known design features which would have helped prevent this shooting and others like it. The Plaintiffs' case assumes that in a products liability context, handgun manufacturers can and should be dealt with the same as any other defendant who makes unreasonable design decisions or provides in-

adequate warnings. We see no reason why they should be excluded. The fact that handguns are meant to fire projectiles which can cause great harm is to our view all the more reason to allow the tort system to assess whether the product is reasonably designed to prevent or help avoid unintended—albeit careless—firings such as occurred here.

{17} Misuse of a product is not of necessity fatal to a products liability cause of action. Suppliers are responsible for risks arising from foreseeable uses of the product, including reasonably foreseeable unintended uses and misuses. UJI 13–1403. The foreseeability of unintended uses and misuses is ordinarily a question for the jury; though there are cases where the use is so unforeseeable that the matter can be taken from the jury. *Van de Valde v. Volvo of Am. Corp.*, 106 N.M. 457, 458–60, 744 P.2d 930, 931–33 (Ct.App.1987) (using a tire restraining strap to secure luggage on a roof rack unforeseeable as a matter of law).

### B. The Negligence Theory

{18} In support of their negligence claims, Plaintiffs allege that Defendants had a duty to Plaintiffs (1) "to use reasonable care in the design, manufacture and [marketing] of the J–22 handgun to ensure that it would be reasonably safe for its foreseeable uses" and (2) to warn Plaintiffs "of all inherent dangers to the J–22 handgun including the fact the weapon could fire a projectile even if the ammunition magazine was removed." Plaintiffs further allege that Defendants failed to fulfill this duty because they did not design the J–22 with a magazine-out safety, or a chamber load indicator, or a printed warning on the J–22.

{19} It is well-established in New Mexico negligence law that manufacturers and distributors of products have a duty to use ordinary care in producing products so as to avoid a foreseeable risk of injury caused by a condition of the product or manner in which it is used. UJI 13–1402; *see also Fernandez*, 118 N.M. at 113, 879 P.2d at 114; *Cleveland*, 890 F.2d at 1554–55. As detailed in UJI 13–1410, the manufacturer of a product must use ordinary care in designing, making, inspecting, tending, and packaging the product. Ordinary care is defined as "that care which a reasonably prudent supplier would use in the conduct of [its] business." UJI 13–1404. What constitutes ordinary care varies with the likelihood of injury and the seriousness of harm which can be reasonably expected; as the foreseeable danger increases, so does the amount of care required. *Id.; see also* UJI 13–1603 NMRA 2001. In deciding whether a supplier has exercised ordinary care, the jury is required to undertake a risk-benefit analysis which includes the usefulness of the product and its ordinary function. UJI 13–1410.

{20} These are bedrock propositions of New Mexico products liability negligence law. It can thus be stated without risk of contradiction that the duty of a product supplier to use ordinary care to avoid foreseeable risks of injury caused by a condition of the product or manner in which it is used exists as a matter of law. *Fernandez*, 118 N.M. at 113, 879 P.2d at 114. There are, however, limits to the duty of care. Manufacturer and supplier have the duty only to consider foreseeable risks of injury. *See Klopp v. Wackenhut Corp.*, 113 N.M. 153, 158, 824 P.2d 293, 298 (1992); *see also* UJI 13–1403. Where an injury is caused by a risk or a misuse of the product which was not reasonably foreseeable to the manufacturer and supplier, they are not liable. *See Klopp*, 113 N.M. at 158, 824 P.2d at 298.

{21} Stated positively, the general duty imposed on manufacturers and suppliers of products to use ordinary care includes a duty to consider risks of injury created by foreseeable misuse of the product. *Id.; see Brooks*, 120 N.M. at 374, 902 P.2d at 56 (discussing policies behind the rule, and noting that car manufacturers must make automobiles that are crashworthy, because it is foreseeable that drivers will drive negligently on the highways); *see also Cleveland*, 890 F.2d at 1554–55 (holding that the plaintiff's misuse of aircraft was objectively reasonable and thus foreseeable); *First Nat'l Bank v. Nor–Am Agric. Prods., Inc.*, 88 N.M. 74, 82, 537 P.2d 682, 690 (Ct.App.1975) (holding vendor liable for selling treated grain which would foreseeably be fed to hogs, making

them and humans who ate them ill); *Fabian,* 582 F.2d at 1262 (holding punch press manufacturer must use ordinary care to avoid risks against which it can expect the user to fail to protect himself); *Moomey v. Massey Ferguson, Inc.,* 429 F.2d 1184, 1188 (10th Cir.1970) (declaring it was not in error to refuse to hold conduct as misuse of product because manner of use was reasonably foreseeable). Thus, a product's misuse by the consumer does not necessarily operate to bar recovery as a matter of law.

{22} The duty of ordinary care is owed to persons who can reasonably be expected to use the product and to persons who can reasonably be expected to be in the vicinity during the use of the product. *Elmore v. Am. Motors Corp.,* 70 Cal.2d 578, 75 Cal.Rptr. 652, 451 P.2d 84, 88 (1969) (en banc) (holding that a product supplier's duty is owed to all who may be foreseeably endangered by the product, especially bystanders); *see also* UJI 13–1402, Committee Comment; Prosser & Keeton, *The Law of Torts* § 100, at 703 (5th ed. 1984) ("There is no longer any doubt that the negligence liability extends to any lawful user of the thing supplied, as well as to a mere bystander . . . .").

{23} Defendants argue that they had no duty of care to Sean because they had no "special relationship" with him. Defendants base this contention on the theory that the injury was caused by D.J.'s criminal act in pointing and firing the handgun at Sean. Because the trigger was pulled by a third party, Defendants contend, they cannot be held liable unless it can be found that they had a special relationship with Sean which imposed a duty to control the conduct of the third person.

{24} Defendants cite the Restatement (Second) of Torts § 315 (1965), *Ciup v. Chevron U.S.A., Inc.,* 122 N.M. 537, 539, 928 P.2d 263, 265 (1996); *Rummel v. Edgemont Realty Partners, Ltd.,* 116 N.M. 23, 26, 859 P.2d 491, 494 (Ct.App.1993); *Torres v. State,* 119 N.M. 609, 612, 894 P.2d 386, 389 (1995); and the dram shop cases including *Lopez v. Maez,* 98 N.M. 625, 651 P.2d 1269 (1982) in support of their argument. These authorities discuss and analyze the factors which should be taken into account when deciding whether an actor has a duty to protect another from the acts of third parties. The issue arises most frequently in the context of landlords and nonpossessory property owners. In *Rummel,* for example, the issue was whether the entity which owned real estate leased by a convenience store chain for one of its outlets had a duty to protect an employee of the store from the acts of a third party. 116 N.M. at 26, 859 P.2d at 494. In *Ciup,* the issue was whether a petroleum products franchisor had a duty to its franchisee's employee to guard against third party acts. 122 N.M. at 539, 928 P.2d at 265. The dram shop cases explore another facet of the general problem. They examine the duty owed by sellers of alcoholic beverages to third parties who may be injured by those to whom they purvey liquor. *See Lopez,* 98 N.M. at 628, 651 P.2d at 1272.

{25} The basic inquiry in all of these cases is whether the defendant has the ability to exercise control over a premise or an activity such that it is reasonable to impose a duty of ordinary care on it as to the management of the premises or activities. At times a duty is found based on the existence of a "special relationship" between plaintiff and defendant. *Rummel,* 116 N.M. at 26–27, 859 P.2d at 494–95. A special relationship can arise as part of a commercial connection between parties, or it can be more or less voluntarily undertaken. *See Sarracino v. Martinez,* 117 N.M. 193, 194–95, 870 P.2d 155, 156–57 (Ct.App.1994) (taking charge of intoxicated passenger created obligation of reasonable care for passenger's safety).

{26} These difficulties are not present in a products liability context. The basic policy decision has been made that the duty of a product distributor extends to persons who can be foreseeably injured by a defective product—including injuries caused by foreseeable misuse of the product if the defect proximately contributes to the injury. *See* UJI 13–1403. Thus, contrary to Defendants' contentions, a "special relationship" between manufacturer/distributor and user is not required to establish a product supplier's duty to make or distribute safe products.

{27} Further, the presence or absence of a special relationship between Defendants and Sean is immaterial because Plaintiffs are clearly not attempting to hold Defendants responsible for failing to control D.J. Plaintiffs are attempting to hold Defendants liable in negligence or strict liability for harm proximately caused by Defendants' affirmative acts of designing and distributing a defective product which combined with D.J.'s subsequent misconduct to injure Sean. "[A proximate cause] need not be the only cause, nor the last nor nearest cause. It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury." UJI 13–305 NMRA 2001. While Defendants are entitled to argue that their liability should be reduced by the percentage of fault attributable to D.J., NMSA 1978, § 41–3A–1(B) (1987), the nature of D.J.'s conduct does not, as a matter of law, prevent Defendants from being held accountable for the foreseeable consequences of their own misconduct. *Torres*, 119 N.M. at 613, 894 P.2d at 390 (holding that duty of care of New Mexico law enforcement officers may extend to out-of-state victims murdered by criminal who remained at large due to alleged negligence of officers investigating earlier murders by same criminal).

{28} Once it has been determined that a duty exists, the limits on that duty under a specific set of facts are ordinarily questions for the jury. *Klopp*, 113 N.M. at 160, 824 P.2d at 300 (holding negligence is an issue to be "decided by the jury whenever reasonable minds may differ"). Under existing New Mexico negligence case law, therefore, the issues of whether Bryco and Jennings breached their duty to design and distribute a safe product by failing to incorporate a magazine out safety device, and/or a chamber load indicator, and/or a warning to users to "check the chamber at all times for a bullet"; whether the boys were foreseeable users of the gun; and whether the alleged design defects or lack of warnings were the proximate cause of Sean's injuries in light of the conduct or misconduct of the minors in this case, are ordinarily all questions of fact for jury determination.

## C. Material Issues of Fact Were Raised by Plaintiffs in Response to Defendants' Motions for Summary Judgment.

{29} Upon the movant for summary judgment "making a prima facie showing, the burden shifts to the party opposing the motion to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *Roth v. Thompson*, 113 N.M. 331, 334–35, 825 P.2d 1241, 1244–45 (1992). Defendants contend that as a matter of law, the J–22 was not a defectively designed product and Defendants were not negligent in the manufacture and design of it. Defendants contend they are entitled summary judgment as to the design and warning defects issues because the J–22 has the following safety features which they argue are sufficient as a matter of law: (1) the J–22 Operator's Parts and Instructions Sheet, which accompanies the newly manufactured gun in its display box, explains all safety concerns, including the safe loading and unloading of the gun; and (2) the word "Fire" is visible when the handgun is in a firing position, and there is a manual safety, which when applied makes the word "Safe" visible and keeps the gun from firing.

{30} Defendants also assert the J–22 handgun was not defectively manufactured because it operated as intended when D.J. intentionally pulled the trigger while pointing it at Sean, even if he did not intend to injure him. Bryco and Jennings representatives testified that had the boys put the existing safety on and not pointed the gun at anyone, as they had been taught by their parents and guardians not to do, the shooting could not have occurred. Defendants also contend they are entitled to summary judgment because the safety devices and warnings Plaintiffs advocate are not feasible for the J–22, and that, in general, there are pros and cons to the desirability, with gun purchasers, of magazine safeties.

{31} Defendants also contend they are entitled to summary judgment because as a matter of law, Bryco and Jennings had no duty to protect these minors against their intentional, reckless, and criminal use of the product. The President of Jennings,

Janice Jennings, testified that in her opinion, the boys' reckless conduct made the accident inevitable. The boys' actions were so reckless, willful, and criminal, Defendants contend, that as a matter of law, this misuse of the gun could not reasonably be foreseen by Bryco and Jennings. Finally, Defendants argue that the boys' actions interrupt the chain of proximate causation. Defendants point to the boys' depositions where they each admitted their actions were "stupid." In addition, the boys admitted that they acted contrary to what they had been taught by their parents or guardians about not handling guns, not pointing them at anyone, and assuming a gun is loaded at all times. The boys admitted that they initially lied to the police about how they got the gun and how the shooting occurred. They also admitted to initially hiding the gun from their parents and the police.

{32} To counter Defendants' criminal and per se negligence theories, Plaintiffs provided evidence that the boys purchased the gun legally at the time. *See* 18 U.S.C. § 922(b)(1) (1994) (making it unlawful for "licensed dealer" to sell a handgun to a juvenile); 18 U.S.C. § 922(1)(x) (1994) (unlawful sale of handgun by "person" to juvenile not enacted until 1994); NMSA 1978, § 30–7–2.2 (1994) (unlawful possession of handguns by juveniles not enacted until 1994). To counter Defendants' assertions that the gun is sufficiently safe, Plaintiffs provided evidence that when purchased, there was no Parts and Instruction Sheet that came with the gun, and that this was a common occurrence in gun sales. In addition, Plaintiffs provided evidence that without the instruction sheet and in the absence of a magazine-out safety, chamber load indicator, or suitable warning (e.g., "check the chamber for a bullet at all times"), that loading and unloading the gun is confusing depending on whether the chamber is checked while the magazine is in or out. If the chamber is viewed while the magazine is in the gun, the chamber will appear empty, but a bullet will then be loaded into the chamber. Removing the magazine, therefore, does not necessarily unload the gun.

{33} While D.J. testified that he "stupidly" pulled the trigger, each of the boys testified that he thought the gun was unloaded because the magazine was out. There was some evidence that Sean or Brian actually, though inadvertently, may have loaded the gun while the magazine was in the gun and before returning it to Michael who thought that, by removing the magazine and keeping it with him while the other boys examined the gun in another room after D.J. showed up, he had made it safe. Michael testified that the chamber was empty when he examined the gun while purchasing it. Then, when Michael removed the magazine and kept it with him in the bathroom while the other boys examined it in another room, Michael testified that he thought the gun was safe and unloaded.

{34} In response to Defendants' contentions that the J–22 had sufficient safety devices and warnings as designed, Plaintiffs provided evidence that patents for magazine-out safeties have been filed in 1912, 1914, 1916, 1921, 1922, 1927, 1945, 1949, 1951, 1977, 1980, 1981, 1984, and 1986. These patent applications specifically articulate the known danger that people will remove the gun magazine and think they have unloaded the gun and then fire it, unintentionally injuring someone. The United States Patent Office granted the first patent for a magazine-out safety device on April 30, 1912. The Patent Abstract for this patent No. 1,024,932, describes a device with the purpose and effect of preventing accidents such as the one in which Sean was injured:

A number of accidents occur in connection with automatic fire arms owing to the fact that if the fire arm is loaded and the magazine withdrawn, persons little acquainted with the operation of these fire arms often believe it to be unloaded while in reality a cartridge remains in the barrel.

The present invention has for its object to obviate such accidents by providing means for setting the weapon automatically at a position of safety immediately the magazine is withdrawn.

*See also Hurst v. Glock, Inc.,* 295 N.J.Super. 165, 684 A.2d 970, 972–73 (App.Div.1996) (reciting a report relying on patents as evidence that the Glock handgun was defective for failing to include a magazine safety, which

the report concluded was a "standard safety feature[ ]" for "[r]esponsible firearms manufacturers and designers"). The report in the *Hurst* case was also based on a National Rifle Association magazine article that lauded the accident-prevention value of a magazine safety and the fact that certain gun makers, including Smith & Wesson, include these safeties on their handguns:

> The reasons for the importance of the magazine safety as pointed out in 1910 [patents], 1916 [patents], and [a] 1958 [*American Rifleman* article] are no less valid or important today ... Responsible firearms manufacturers and designers produce and design guns with this important device as one of the guns['] standard safety features.

*Id.*

{35} In response to Defendants' contentions that the boys' misuse of the gun was unforeseeable or interrupted proximate causation, Plaintiffs provided government studies that show that the kind of unintentional shooting that occurred in this case is relatively common and might have been prevented if the person handling the gun had known it was loaded. For example, a nationally published study by the United States General Accounting Office reported in 1991 that 23% of unintentional shootings in America might have been prevented if the person handling the gun had known it was loaded. Another study showed that in New Mexico, 25 children aged 0–14 years old were killed in unintentional shootings between 1984 and 1988. During depositions, Defendants admitted they could foresee that children and teenagers would be able to access the J–22, and could be injured from handling a gun they believed to be unloaded. Plaintiffs' evidence would permit a reasonable jury to find that at the time the J–22 handgun was manufactured, Defendants were on notice, knew, or should have known of the risks posed by bullets in the chamber through the numerous patents filed about this issue, existing designs by other gun manufacturers, and through lawsuits against gun manufacturers and distributors.

{36} Documents and advertisement flyers showed that recent handguns manufactured and distributed by Defendants have incorporated a magazine-out safety that blocks the trigger bar and disables the handgun so that it cannot fire when the magazine is removed, and a chamber load indicator device to guard against the risks posed by a bullet hidden in the chamber. Plaintiffs quoted Defendants' testimony that, notwithstanding, Defendants did not consider additional safety devices for the J–22; that no product analyses were conducted on the J–22; that no one reviews Bryco products to see if they can be made safer; and that Bryco did not investigate what other manufacturers were doing to make their firearms safer.

{37} Defendants admitted that had a magazine-out safety been in the J–22 at the time D.J. fired, the gun would not have fired and Sean would not have been shot.

{38} This is not a case where the use to which the product was put is so unforeseeable as a matter of law that the case should be taken from the jury under either a strict products liability or negligence theory. *See Van de Valde*, 106 N.M. at 458–60, 744 P.2d at 931–33 (holding use of a tire restraining strap to secure luggage on a roof luggage rack unforeseeable as a matter of law). Moreover, Plaintiffs are not arguing that the J–22 is per se defective because it is a gun and capable of being misused for intentional shootings. *See Armijo v. Ex Cam, Inc.*, 656 F.Supp. 771, 773–75 (D.N.M.1987) (rejecting plaintiff's argument that defendants' guns were per se defective because the risk of them being misused by murderers outweighed their utility).

{39} In addition, Plaintiffs' feasibility evidence conflicted with Defendants' contentions on that point. Plaintiffs provided evidence indicating that installing the safety devices and warnings were both feasible and inexpensive. The cost of the magazine out safety parts is about 22 cents and the cost of the chamber load indicator parts about 8 cents, adding about 30 cents to the manufacturing price of the J–22. Finally, Plaintiffs presented the affidavits of three experts on the issues of feasibility, foreseeability, and causation. Vaughn P. Adams, Jr., Ph.D., P.E., is a registered industrial and safety engineer who has qualified as an expert in numerous cases

and has testified on safety devices and fire-arms. In his opinion, Bryco and Jennings failed to provide reasonable safeguarding means which were available and widely known at the time the J–22 handgun was designed, manufactured, and distributed, to control the recognized hazard of unintentional discharge of their handgun under foreseeable conditions, including the occurrence of a cartridge unknowingly remaining in the chamber when the magazine was removed. He also opined that it was foreseeable that severe injury and death will be caused when individuals handle a loaded handgun which they believe is unloaded. David P. Sklar, M.D., Chairman of the Department of Emergency Medicine, Professor of Internal Medicine, and Medical Director of the Center for Injury Prevention, Research, and Education at the University of New Mexico School of Medicine, also opined about the foreseeability of accidental shootings like the one that injured Sean. Robert L. Hillberg, a firearms manufacturer and designer, opined about the feasibility of installing additional safeties and warnings on the J–22.

**CONCLUSION**

{40} For years, New Mexico courts have held manufacturers and distributors responsible for marketing products that pose an unreasonable risk of injury. *See Brooks*, 120 N.M. at 375–80, 902 P.2d at 57–62 (discussing history of products liability law in New Mexico). In this case, we are applying existing principles of products liability under New Mexico law to another type of product supplier: the manufacturer and distributor of the J–22 handgun. We are not changing the law.

{41} Plaintiffs' claims pose the question whether the gun could function as intended and yet be made safer. Plaintiffs contend that the J–22 is defective because it did not incorporate safety devices and warnings designed to prevent foreseeable unintentional shooting accidents, a claim well within existing New Mexico products liability and negligence law. We note that the open and obvious danger rule has been abolished in New Mexico and a risk is not made reasonable simply because it is made open and obvious to persons exercising ordinary care. *Klopp*, 113 N.M. at 157, 824 P.2d at 297.

Thus, several of the out-of-state cases on which Defendants rely, *e.g., Treadway v. Smith & Wesson*, 950 F.Supp. 1326 (E.D.Mich.1991), are not controlling in this jurisdiction.

{42} Whether the type of misuse evident in this case was foreseeable, whether the existing features of the J–22 are sufficiently safe, and whether it was feasible without impairing the utility of the gun or being unduly expensive for Bryco and Jennings to incorporate the advocated safety devices and/or warnings into the design of the J–22, are all issues for the jury to decide. To determine whether Bryco and Jennings are strictly liable for Sean's injuries, the jury will assess whether the product as designed posed an unreasonable risk of injury to these minors. To determine whether Bryco and Jennings are liable under a negligence theory, the jury will assess whether they were negligent in adopting the particular design of the J–22.

{43} The testimony, documents, and affidavits produced by Plaintiffs in response to Defendants' motions for summary judgment establish that reasonable minds could disagree on these issues.

{44} Because there remain material issues of fact for resolution by the jury, Defendants are not entitled to judgment as a matter of law. The trial court erred, therefore, in granting summary judgment and in removing these material issues of fact from jury decision. The judgment of the trial court is reversed and this case is remanded for proceedings consistent with this opinion.

{45} IT IS SO ORDERED.

A. JOSEPH ALARID, Judge, and LYNN PICKARD, Judge, concur.